1

2

3

4

5

6

7

8

9             IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11   ROBERT KOSHMAN,

12           Plaintiff,                    No. CIV S-09-3312 KJM DAD
          vs.
13
     TOM VILSACK, U.S. Secretary of
14   Agriculture, in his official capacity,
     et al.,
15           Defendants.                    ORDER

16   _____/

17           This matter was on calendar on April 6, 2011 on cross-motions for summary

18   judgment filed by plaintiff Robert Koshman and by defendants Tom Vilsack, the United States

19   Department of Agriculture (USDA), David White, USDA Natural Resource Conservation

20   Service (NRCS), Jonathan Coppess, and the USDA Farm Service Agency (FSA).  David M.

21   Ivester of Briscoe, Ivester & Bazel LLP appeared for plaintiff; Lynn Trinka Ernce, Assistant

22   United States Attorney, appeared for defendants.  For the reasons set forth below, the court

23   denies defendants' motion and grants plaintiff's motion.

24   /////

25   /////

26   /////

                                        1

1  I. Background[1]

2         Defendant USDA is the agency in charge of agriculture-related programs,

3  including wetland conservation and farm subsidy programs, which defendants NRCS and FSA

4  administer jointly.  ECF No. 27 ¶¶ 3-5.  Plaintiff  Robert Koshman, his family, and the Koshman

5  Family Trust ("the trust"), have obtained USDA program benefits in the past.  ECF No.  27 ¶ 1.

6  They have owned land in Placer County for decades and had produced rice on Fields 7, 7a and

7  8a before 1985, including in the 1950s and 1960s.  ECF No. 27 ¶ 1; AR 15, 28.[2]

8         In December 1996, NRCS issued a certified wetland determination that Fields 7

9  and 8a of Koshman Family Trust properties contained a total of 34.3 acres of farmed wetlands.

10  ECF No. 32 ¶ 3.  This determination did not delineate or identify the specific location of the

11  wetlands within these fields.  Rather, NRCS notified the Trust it should contact NRCS for a

12  wetlands delineation "prior to any further manipulation of soils, topography or hydrology. . . ."

13  ECF No. 32 ¶ 5; AR 149.  The Koshmans did not appeal the determination.  ECF No. 32 ¶ 6.

14         In January 1998, plaintiff notified the NRCS in writing that he wanted to laser

15  level Field 7 because "he could be more efficient when working the ground with the equipment"

16  and "[i]t takes less time and less money to work a rice field with square checks than a field that

17  has crooked checks."  ECF 32 ¶ 7; AR 143.  He said he had "been producing rice off this ground

18  for many years," and that all he had to do was "disk the ground and plant.  I do not need to drain,

19  dredge, fill, level this land to produce a crop of rice."  AR 143.  He concluded that "[i]f for some

20  reason the government says I'm not to do this, please let me know."  AR 144.  Plaintiff noted

21  that if he could not undertake laser leveling, he would "summer flow the ground and put the rice

22  checks back where they were" so he could plant rice in 1999.  AR 144.

23  _____

24         [1]  Unless otherwise noted, the following facts are undisputed.  *See* Defendants' Response
to Plaintiff's Statement of Undisputed Material Facts, ECF No. 27; Defendants' Reply to
Plaintiff's Response To Defendants' Separate Statement of Undisputed Facts, ECF No. 32.

25

26         [2]  The AR numbers refer to the Bates-stamped pagination of the administrative record
rather than the tab numbers.

1        NRCS responded that laser leveling "would be altering the field conditions that

2  existed in 1985 which could create a 'Converted Wetland' situation," but that plaintiff could

3  "maintain the field to the extent that existed prior to 12/23/85." ECF No. 32 ¶ 9; AR 142. The

4  District Conservationist told plaintiff he would visit the area the following month and "strongly

5  recommend[ed] that you not do anything prior to our scheduled visit which could jeopardize

6  compliance with the Food and Security Act provisions." ECF No. 32 ¶ 10; AR 142.

7        In May 1998, plaintiff again asked the NRCS to undertake a wetland delineation

8  of the property and sought permission to re-level the field, install rectangular rice checks and

9  plant rice. ECF No. 32 ¶ 11; AR 139. NRCS told plaintiff the process could take as long as two

10  years and would involve the development of a mitigation plan, but that he could plant rice so

11  long as he left surface drainage patterns intact. ECF No. 32 ¶ 12-13; AR 139. With its letter to

12  plaintiff, NRCS included a copy of NFSAM [National Food Security Act Manual] 514.20, which

13  addresses "Identifying Wetlands Where The 1985 Act Restrictions Apply." ECF No. 32 ¶ 14;

14  AR 140-141. The administrative record does not include any information suggesting that

15  plaintiff went forward with the delineation at that time.

16        In 2002 and 2003, plaintiff undertook laser leveling of his fields. He planted rice

17  in Field 7A in 2002 and in Fields 7 and 8A in 2003; he did not consult NRCS or seek a wetlands

18  determination before doing so. ECF No. 32 ¶¶ 15-18; ECF No. 27 ¶ 7; Compl. ¶ 7; AR 54. In

19  May 2003, plaintiff signed two AD-1026 ["Highly Erodible Land Conservation (HELC) And

20  Wetland Conservation (WC) Certification"] forms and answered "no" to the question whether

21  anyone had conducted or will conduct any activities, including leveling, on the property. ECF

22  No. 32 ¶ 19; AR 133-138.

23        In a letter dated November 7, 2003, NRCS informed plaintiff of its preliminary

24  determination that he had violated the Swampbuster provisions of the Food Security Act, 16

25  U.S.C. § 3821, *et seq*., by converting wetlands in 2002 and 2003. ECF No. 32 ¶ 20; AR 131.

26  Specifically it said that "your manipulation by lasier [*sic*] leveling on this wetland area is

considered an alteration that makes the area more farmable which is a violation of Swampbuster provisions." AR 113.

Plaintiff appealed this determination, arguing that "by laser leveling he was improving the land for better water management and was not in violation." AR 113. In response to the appeal, NRCS inspected the property and examined FSA compliance slides as well as aerial photographs. ECF No. 32 ¶ 22; AR 124-128. NCRS prepared its final technical determination, finding that "substantial earth moving occurred during 2002 (field 7 and 7A) and 2003 (field 8a) that resulted in the conversion of wetlands." ECF No. 32 ¶ 23; AR 118 & 124. It also noted that some areas in Field 8A were still farmed wetland or artificial wetlands, but "the remainder of wetlands on all fields are now considered [converted] wetlands because manipulation (fill) resulted 'in impairing or reducing the flow, circulation or reach of water'" on twenty-four acres, citing NFSAM § 514.24b. ECF No. 32 ¶¶ 24, 27; AR 98, 124. NRCS further found that rice was produced on Field 7 in 2002 and on Field 7A in 2002 and 2003, and that "production was made possible in field 7A in 2002 and field 8A in 2003." ECF No. 32 ¶ 25; AR 54, 118. The agency informed plaintiff that the determination would remain in effect until there was mitigation, and that his eligibility for USDA benefits would be affected. ECF No. 32 ¶ 26; AR 118.

After this determination, FSA notified plaintiff that the Trust and anyone associated with it had to refund USDA benefits from July 2002 forward, totaling $173,368. ECF No. 32 ¶ 28; AR 84. Plaintiff appealed this determination, arguing that the land had been leveled in the past. AR 112, 113.

In February 2004, the FSA County Committee reviewed the case file, the information provided by plaintiff, the NRCS technical determination, the report from the NRCS inspection team, photographs and slides and NRCS procedures, and concluded that "a violation did occur." ECF No. 32 ¶ 29; AR 110.

/////

Plaintiff appealed this determination to the National Appeals Division (NAD) of the USDA.  AR 10.  He provided "a short explanation of the basis of the appeal," including his argument that any actions that served only to make his fields "more farmable" as NRCS had determined did not violate the Swampbuster provisions of the FSA.  AR 73.  Plaintiff argued specifically that neither the law nor the regulations allowed a wetland conversion to be based on a determination that actions made fields "more farmable."  AR 74.

NRCS argued to the NAD that plaintiff was aware that there was a wetland determination as to the fields at issue; that he had not appealed that determination; that it had "determined the wetland to be converted as a result of the action of leveling the field, resulting in hydrologic manipulation that makes the area more farmable."  AR 92-97.

After conducting a hearing, the NAD hearing officer requested "additional information on the methodology used by the Natural Resources Conservation Service (NRCS)" in determining that the fields at issue had become converted wetlands as well as FSA documentation about rice production in 2002 and 2003.  The officer also posed several questions to the parties.  AR 64-65.

In resolving the appeal, the hearing officer framed the issues to be decided as: "did appellants produce rice in previous years (prior to 1985) on the same fields as they did in 2002 and 2003" and "did appellants' moving of soil by the use of laser leveling cause Farmed Wetlands (FW) to become converted wetlands."  AR 27.  The officer made several findings of fact: (1) that plaintiff used laser leveling on fields 7, 7a and 8a in 2002 and 2003 "to conserve water" but that rice levees had been present in those fields before the 1985 enactment of the Food Security Act; (2) plaintiff produced rice on these fields as early as 1962 and during the mid 1960s; (3) plaintiff produced rice on these fields in 2002 and 2003; (4) NRCS's November 7, 2003 preliminary technical determination found that plaintiff's laser leveling constituted a wetlands violation; (5) during a physical inspection in late November 2003, NRCS found substantial movement of earth, which "resulted in conversion of wetlands;" (6) in December

5

2003, an NRCS biologist visited the fields and found that "manipulation (fill) resulted in impairing or reducing the flow, circulation, or reach of water" and that "substantial earth moving" had occurred, but said more interpretation of aerial photographs was necessary to determine how many acres and locations were manipulated; and (7) in February 2004, the FSA confirmed a wetlands violation.  AR 28-29.  The hearing officer then said that while "laser leveling may result in converted wetlands," such leveling must be undertaken to "'make the production of an agricultural commodity possible" when such production would not otherwise have been possible.  AR 30-31.  He rejected NRCS's argument that "laser leveling, by definition, results in converted wetlands" because "the plain reading of the . . . statutes and regulation, applicable sections from NFSAM . . . do not, in this case, support his argument . . . ."  AR 31. The officer ultimately ruled that NRCS's determination that plaintiff converted the wetlands was erroneous because the "laser leveling was not manipulation that made rice production 'possible' . . . because rice production was already possible as early as 1962."  ECF No. 32 ¶ 30; AR 28-31.

The FSA and NRCS requested a Director's Review of this determination.  AR 22-23, 25-26, 806-812.  They argued that the hearing officer based his determination solely on the fact that plaintiff had previously planted rice on the site and that while "[p]roduction may have been possible before laser leveling took place, . . . laser leveling would have definitely contributed to improved water management efficiencies, uniformity of depth across the fields, and ultimately crop yields."  AR 25, 22.  They continued that after the laser leveling and filling, the "fields had their hydrology significantly reduced or eliminated."  AR 23, 26.

On August 25, 2004, the Director reversed the NAD decision and agreed with FSA's determination that plaintiff had converted wetlands.  ECF No. 32 ¶ 31; AR 13.  He rejected the hearing officer's second and third factual findings, but adopted the rest, including these undisputed facts: (1) the Koshman family produced rice on the fields "prior to 1985, including the 1950s and 1960s;" (2) in 1998, NRCS became aware that plaintiff intended to laser level field 7 and so advised plaintiff that he "could only maintain the field to the extent that

existed prior to December 23, 1985" and that laser leveling would alter these conditions; (3)

during its on-site review, the NRCS inspectors "found that substantial earth movement had

occurred as a result of the laser leveling;" that "the land leveling substantially filled shallow

areas of the wetland," including one area that contained "12 inches of fill," and concluded that

"the laser leveling altered the wetland hydrology of the farmed wetland areas and made the land

more farmable." AR 15-16.  The Director said the hearing officer had not ruled on whether the

laser leveling would make the lands more farmable, but rather focused on the prior rice

production on the fields.  AR 17.

The Director said:

> The intent of . . . .16 U.S.C. § 3801 is to conserve wetlands.  A strict reading of 16 U.S.C. § 3801(a)(6)(A) would exclude all farmed wetlands from conversions.  Farmed wetlands, by definition, are wetlands that prior to December 23, 1985, were manipulated and **used to produce an agricultural commodity**. . . . To provide protection to areas classified as farmed wetlands, the issue is not whether the production of an agricultural commodity was possible before the manipulation but rather, whether Appellants' manipulation made the land more farmable.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Unlike most manipulations, where a producer drains a wetland to produce a crop, Appellants manipulated the farmed wetlands and altered wetland hydrology in an attempt to retain more water for their rice crop.  Although Appellants maintain that the purpose of the laser leveling was solely to conserve water, the evidence shows that the laser leveling will assist in Appellants' rice production, since it will allow water to stay in the wetland areas for a longer duration.  Thus, Appellants' laser leveling constituted a conversion because it made the lands more farmable.

AR 18-19 (emphasis added).

Plaintiff asked for reconsideration of this decision, arguing that the Director's

reliance on the "more farmable" standard exceeded the authority granted by Congress.  AR 6-12;

*see* 7 C.F.R. § 11.11 (1999).

/////

1    The Deputy Director of the NAD issued a decision on this request.  He rejected

2    the Director's conclusion that plaintiff had leveled the fields to better retain water, finding it not

3    supported by the hearing record, but found the error did not matter because other material,

4    including plaintiff's testimony, supported NRCS's determination that laser leveling made the

5    land more farmable.  AR 5B.  He concluded that "through better water management, Mr.

6    Koshman is increasing the productivity of the land," which "supports the conclusion that the

7    laser leveling will assist in Appellant's rice production, making the land more farmable."  AR

8    5B-5C.

9    II.  Summary Judgment And The Review Of Agency Proceedings

10    This court's review of the agency's determination in this case is governed by the

11    Administrative Procedures Act (APA), 5 U.S.C. § 701, *et seq*.  Because the APA requires the

12    court to "review the whole record or those parts of it cited by a party," the court does not

13    determine whether there are disputed issues of material fact, as it would in a typical summary

14    judgment proceeding.  *Occidental Engineering Company v. Immigration and Naturalization*

15    *Service*, 753 F.2d 766, 769 (9th Cir. 1985) (court's function is to determine whether or not as a

16    matter of law the evidence in the administrative record permitted the agency to make the

17    decision it did); *see also South Yuba River Citizens League v. National Marine Fisheries*

18    *Service*, 723 F. Supp. 2d 1247, 1256 (E.D. Cal. 2010) (usual summary judgment standards do not

19    apply).  Instead, this court must consider whether the agency's actions, findings and conclusions

20    are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . .

21    ."  5 U.S.C. § 706(2) (A).  The court's inquiry must be searching, but the ultimate standard is

22    /////

23    /////

24    /////

25    /////

26    /////

8

1   narrow. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).  Under this

2   narrow standard, a decision is arbitrary and capricious

> only if the agency relied on factors Congress did not intend it to
> consider, entirely failed to consider an important aspect of the
> problem, or offered an explanation that runs counter to the
> evidence before the agency or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

6   *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (internal quotation, citation

7   omitted).

8   III.  Analysis

9          Plaintiff argues that NAD's final determination in the ultimate appeal in his

10  administrative case does not conform to the statutes or even to the agency's own regulations.  He

11  also argues that the changing rationalization for the determination demonstrates the invalidity of

12  the agency's position.  The agency counters that it properly determined that plaintiff converted

13  wetlands within the meaning of the statute and regulations.

14         A.      Statutory and Regulatory Framework

15         In 1985, Congress passed the so-called Swampbuster provisions of the Food

16  Safety Act, which prohibit farmers who receive USDA benefits from converting wetlands and

17  using them for agricultural production.  16 U.S.C. § 3821(a)-(b).  In 1990, Congress extended

18  the prohibition to the conversion of wetlands that makes agricultural production possible, even if

19  nothing is in fact produced.  16 U.S.C. § 3821(c); 7 C.F.R. § 12.4(a)(3).  After 1990, a prohibited

20  conversion results in the loss of all USDA benefits on all of a farmer's land until the wetland is

21  restored or mitigated.  16 U.S.C. § 3821 (c).  *See Holly Hill Farm Corporation v. United States*,

22  447 F.3d 258, 263 (4th Cir. 2006).

23  /////

24  /////

25  /////

26  /////

Statute and regulation provide the definition of a converted wetland:

(A) The term "converted wetland" means wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible if--

   (i) such production would not have been possible but for such action; and

   (ii) before such action--

      (I) such land was wetland; and

      (II) such land was neither highly erodible land nor highly erodible cropland.

(B) Wetland shall not be considered converted wetland if production of an agricultural commodity on such land during a crop year--

   (i) is possible as a result of a natural condition, such as drought; and

   (ii) is not assisted by an action of the producer that destroys natural wetland characteristics.

16 U.S.C. 3801(6)(A);[3] *see also* 16 U.S.C. § 3821(c) ("any person who in any crop year beginning after November 28, 1990, converts a wetland by draining, dredging, filling, leveling, or any other means for the purpose, or to have the effect of, making the production of an agricultural commodity possible on such converted wetland shall be ineligible for . . . payments . . . .").

/////

/////

/////

/////

_____

[3] In 2008, this section was renumbered as 3801(a)(7), but at the time relevant here it was numbered as shown here.

1    According to the regulations, even under the Swampbuster law, farmers may

2    continue to work wetlands that were farmed before December 23, 1985.  The regulations provide

3    a definition:

4         Farmed wetland is wetland that prior to December 23, 1985, was
          manipulated and used to produce an agricultural commodity, . . . .

5

6    7 C.F.R. § 12.2(a).  The intersection of the two types of wetlands also is addressed in the

7    regulations:

8         A wetland shall not be considered to be converted if:

9         (1) Production of an agricultural commodity on
          such land is possible as a result of a natural

10        condition, such as drought, and it is determined that
          the actions of the person producing such

11        agricultural commodity does not permanently alter
          or destroy natural wetland characteristics. . . ; or

12
          (2) Such land is correctly identified as farmed

13        wetland or farmed wetland pasture.

14   7 C.F.R. § 12.32 (b).  As noted, agricultural production may continued on farmed wetland under

15   certain circumstances:

16        The provisions of § 12.32(b)(2) are intended to protect remaining
          functions and values of wetlands described therein.  Persons may

17        continue to farm such wetlands under natural conditions or as they
          did prior to December 23, 1985.  However, no action may be taken

18        to increase effects on the water regime beyond that which existed
          on such lands on or before December 23, 1985, unless NRCS

19        determined the effect on losing remaining wetland values would be
          minimal . . . .

20

21   7 C.F.R. § 12.33.

22   /////

23   /////

24   /////

25   /////

26   /////

11

1        B.        NFSAM

2                  The USDA also has promulgated the National Food Security Act Manual

3    (NFSAM), noted above.  The Third Edition (1996) of the NFSAM provides in relevant part:

4                      b.  Explanation of Terms.  **The 1985 Act's** wetland restrictions
                       apply to lands which continue to provide important wetland
5                      functions and values.  Restricted activities are generally associated
                       with "manipulation" and "**for the purpose of**", or "making
6                      production possible." . . . . .

7                      c.  Explanation of "Manipulation"  Manipulation is the alteration of
                       the hydrology and/or the removal of woody vegetation . . . on a
8                      wetland . . .

9                      d.  Explanation of "Making Production Possible"  Making
                       production possible means manipulation:
10
                       which allows or would allow production of an agricultural
11                     commodity where such production was not previously possible, or

12                     making an area farmable more years than previously possible, or

13                     which reduces crop stress and allows increased crop yields. . . .

14                     e.  "For the purpose of" means:

15                     Actions completed that show an intent to make production
                       possible.  Such actions need not actually make agricultural
16                     commodity production possible.  Actions discovered in progress
                       which show an intent to, or if completed, would make possible the
17                     production of an agricultural commodity are also considered a
                       conversion.
18

19   AR 140-141 (emphases in original).

20        C.        Review of Agency Construction of a Statute

21                  There are two steps in a court's review of an agency's construction of a statute.

22   *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842 (1984).  First the court

23   must determine "whether Congress has spoken to the precise question at issue," without

24   deferring to the agency's interpretation.  *Id*. at 843; *Los Angeles Haven Hospice, Inc. v. Sebelius*,

25   638 F.3d 644, 660 (9th Cir. 2011); *Northwest Motorcycle Association v. United States*

26   *Department of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  If the intent is clear and the

1   agency's interpretation conflicts with Congressional intent, "that is the end of the matter."

2   *Chevron*, 467 U.S. at 842-43.  This is because a court must presume "'that the legislature says in

3   a statute what it means and means in a statute what it says there.'"  *Amalgamated Sugar Co.,*

4   *LLC v. Vilsack*, 563 F.3d 822, 829 (9th Cir.) (quoting *McDonald v. Sun Oil Co*., 548 F.3d 774,

5   780 (9th Cir. 2008), *cert. denied sub nom. American Crystal Sugar Co. v. Vilsack*, 130 S.Ct. 280

6   (2009).

7            Only if Congress "has not directly addressed the precise question at issue," will

8   the court consider whether the agency's interpretation is permissible.  *Id.*  At the second step, the

9   court does not construe the statute in the first instance, but rather determines whether the

10  regulation is "arbitrary, capricious, or manifestly contrary to the statute."  *Chevron U.S.A.*, 467

11  U.S. at 843-44.

12        D.    Discussion

13           Plaintiff argues that the converted wetland statute is clear: only when a

14  manipulation allows agricultural production on land when none was possible before is the

15  wetland "converted."  The defendants on the other hand rely on *Clark v. United States Dept. of*

16  *Agriculture*, 537 F.3d 934 (8th Cir. 2008), which found the word "possible" to be ambiguous,

17  where it appears in the Swampbuster provisions of the Act, and the agency's regulatory

18  interpretation to be permissible.

19           In answering the first *Chevron* question, this court employs the traditional tools of

20  statutory construction, the first of which is an examination of the plain language of the statute.

21  *Chevron*, 467 U.S. at 843 n.9; *Cuellar de Osorio v. Mayorkas*, 656 F.3d 954, 961 (9th Cir. 2011).

22  Congress's definition of a converted wetland at 16 U.S.C. § 3801(6)(A) requires some sort of

23  change in the land undertaken "for the purpose of . . . making the production of an agricultural

24  commodity possible" if "such production would not have been possible but for such action. . . .

25  ."  As "possible" is not defined in the act, the court construes it in accordance with its "ordinary

26  or natural meaning."  *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994); *Human*

13

*Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990, 1021 (9th 2010), *cert. denied*, ___ U.S.

___, 131 S.Ct. 1477 (2011).  In doing so, the court may consult a dictionary.  *Padilla v. Lever*,

463 F.3d 1046, 1056 (9th Cir. 2006).  According to Webster's Third New International

Dictionary (1976), "possible" is "falling within the bounds of what may be done, . . . ."  The

court also must consider that meaning arises from context:  The terms must be examined as

constituent parts of a statutory whole because meaning or ambiguity may only become evident in

context.  *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

132-33 (2000); *Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997).  Here, the Act defines

"converted wetland" twice, using the same definition and without suggesting that the term

"possible" should be interpreted differently in the different provisions.  *Compare Robinson,* 519

U.S. at 343-44 (looking at different ways term "employee" was defined in different provisions of

Title VI and finding it ambiguous).

   In *Clark*, a farmer and her son decided to convert a pasture so that it could be

used in row cropping, and filled in two areas that NRCS classified as wetlands.  An NRCS

employee notified Clark that her manipulation of the pastureland was "considered an alteration

that makes the area more farmable . . . ."  537 F.3d at 936-37.  After unsuccessfully pursuing her

administrative remedies, Clark filed suit in district court, asking the district court to define the

word "possible" strictly, so that "a wetland is not a converted wetland if it is capable of

supporting any quantity or quality of agricultural commodity production," and arguing that it is

the USDA's burden to prove that the land could not produce agriculture commodities before the

manipulations.  *Id*. at 938.  The district court rejected Clark's arguments.

   The Eighth Circuit characterized Clark's appeal as turning "largely on questions

of statutory interpretation."  *Id*. at 939.  It continued that "the dispute regarding the USDA's

wetlands determination centers on the word 'possible' used in the phrases 'making the

production of an agricultural crop[4] possible' and 'such production would not have been possible.

16 U.S.C. § 3801(a)(6)(A)." *Id.* at 940.  The court said:

> Read in isolation, the term 'possible' might appear unambiguous,
> and Clark's strict interpretation might seem appropriate.  We
> believe, however, that read in context, the phrases containing the
> word possible are ambiguous.  The phrases describe the production
> of agricultural commodities–commercial biological processes in
> which success might be measured by several different standards,
> for example, strictly in terms of technical growth or in terms of
> commercial feasibility.

*Id.* at 940.  The court did not further analyze or explain why the word "possible" became

ambiguous when combined with the notion of agricultural production, but rather simply stated

this as obvious.[5]  It is not so obvious to this court.

In the statute, the word "possible" modifies the word "production," which is not

defined in the Act.  Production means, among other things, "the act or process of producing,

bringing forth or making" or "the making of goods available for human wants."  *See* Webster's

Third New International Dictionary.  Production also is modified, as the Eighth Circuit

recognized, by the prepositional phrase "of an agricultural commodity."  Defining "agricultural"

adds no ambiguity: it means "'of, relating to, or used in agriculture' and 'agriculture' ordinarily

means 'the science or art of cultivating the soil.'"  *Audubon Society of Portland v. United States*

*Natural Resources Conservation Service*, __ F.Supp. 2d __, 2012 WL 141496, at *4 (D. Or. Jan.

18, 2012).  Nor does the term commodity suggest ambiguity:  A "commodity" is "an economic

good, esp. a raw material or an agricultural product," Black's Law Dictionary (9th Ed. 2009); *see*

*also* Webster's Third New International Dictionary (commodity is "an economic good, *esp* : a

product of agriculture, mining, or sometimes manufacture . . . .)  "Technical growth" by itself is

---

[4]  The statute uses the word "commodity;" the court used "crop."

[5]  The term "agricultural commodity" is defined in the act, but in a somewhat circular
fashion: "the term 'agricultural commodity' means — (A) any agricultural commodity planted
and produced in a State by annual tilling of the soil. . . ."  16 U.S.C. § 3801(a)(1).

1    not covered by this definition.  By interpreting all parts of the phrase to mean that the

2    manipulation must make the production of an object of trade or an economic good possible, there

3    is no ambiguity: land that had "'occasionally produced one stunted ear or corn or pod of

4    soybeans prior to being filled,'" *Clark*, 537 F.3d at 941, would be deemed converted if it could

5    sustain a commercially-feasible crop after manipulation, whereas land that produced a

6    commodity before the manipulation would not be.  Even if land was "in any measure farmable

7    prior to manipulation," it could still be deemed converted if the changes made the production of

8    a commodity, as opposed to the technical growth of crops, possible.

9            This construction is supported by additional language of the statute:  a conversion

10   occurs only if the production "would not have been possible but for" the manipulation.  16

11   U.S.C. § 3801(6)(A)(i).  In using this familiar term – "[t]he cause without which the event could

12   not have occurred" – Congress emphasized the idea that production of a commodity would not

13   have been possible without the changes undertaken by the landowner.  Black's Law Dictionary

14   (9th ed. 2009).

15           In *Clark*, the Eighth Circuit found its interpretation consonant with the purpose of

16   the Swampbuster Act: "'to combat the disappearance of wetlands through their conversion into

17   crop lands.'"  537 F.3d at 941 (quoting *Gunn v. U.S. Department of Agriculture*, 118 F.3d 1233,

18   1235 (8th Cir. 1997)).  In this case, as well, defendants rely on the purpose of the statute in

19   arguing for its interpretation of the provisions at issue.  Generally, however, a court need not

20   examine legislative history as an aid to interpretation "'unless the legislative history clearly

21   indicates that Congress meant something other than what it said.'"  *Transwestern Pipeline Co.,*

22   *LLC v. 17.19 Acres of Property*, 627 F.3d 1268, 1271 (9th Cir. 2010) (quoting *Greenwood v.*

23   *CompuCredit Corp.*, 615 F.3d 1204, 1207 (9th Cir. 2010), *rev'd and remanded*, ___ U.S. ___,

24   132 S.Ct. 665 (2012)).  However, if "reliance on the literal language of a statute" would defeat

25   the law's "plain purpose," the court must go beyond the literal language.  *Bob Jones University*

26   *v. United States*, 461 U.S. 574, 586 (1983); *E.E.O.C v. Nalbandian Sales, Inc.*, 36 F.Supp.2d

1206, 1209-10 (E.D. Cal. 1998).  The Committee Reports on a bill are the "'authoritative source

for finding the Legislature's intent.'"  *Northern California River Watch v. Wilcox*, 633 F.3d 766,

775 (9th Cir. 2011) (quoting *Garcia v. United States*, 469 U.S. 70, 76 (1984)).

   The Swampbuster provisions were only one portion of the Food Security Act of

1985, which was designed "to extend and revise agricultural price support and related programs,

to provide for agricultural export, resource conservation, farm credit, and agricultural research

and related programs, to continue food assistance to law-income persons, to ensure consumers an

abundance of food and fiber at reasonable prices, and for other purposes." *See* Pub.L. No. 99-

198.  Among the provisions dealing with cotton, sugar, peanuts, soybeans, and sugar is a section

on conservation.  *Id.* § 1201.  The Senate Agriculture Committee, considering the Swampbuster

provisions of this omnibus bill, described their purpose as "discourag[ing] the draining and

cultivation of wetland that is unsuitable for agricultural production in its natural state. " S. Rep.

99-145 (1985), 1985 WL 57068, at *1969.  The House Agriculture Committee described

wetlands as "priceless resource[s]" and noted that the Swampbuster provisions of the Food

Safety Act would make a farmer ineligible for benefits if he "produces agricultural commodities

on converted wetland–wetland that has been substantially altered or drained."  H.R. Rep. 99-

271(I), 1985 WL 47145, at *1189.  Neither of these legislative statements suggests that Congress

meant something other than what it said in defining converted wetlands; both recognize that farm

production could continue in some instances despite the wetland characteristics of the land.

   Because the statute is not ambiguous, the court does not proceed to step two of

the *Chevron* analysis, but turns instead to a determination of whether the agency's interpretation

conflicts with the plain language of the statute at issue here.  The Deputy Director determined

that plaintiff had converted the wetland by "making the land more farmable," which in turn was

accomplished "through better water management," which allowed plaintiff to increase

productivity and assist in his rice production.  AR 5B-5C.  This interpretation conflicts with the

/////

17

plain statutory definition of a converted wetland, as discussed above, and is therefore "not in accordance with the law." 5 U.S.C. § 706(2).

IT IS THEREFORE ORDERED that:

1. Defendants' motion for summary judgment is denied; and

2. Plaintiff's motion for summary judgment is granted.

DATED:  March 31, 2012.

_____
UNITED STATES DISTRICT JUDGE

18